1  Gregory Lantier (*pro hac vice*)
   Gregory.Lantier@wilmerhale.com
2  Haixia Lin (*pro hac vice*)
   Haixia.Lin@wilmerhale.com
3  WILMER CUTLER PICKERING
     HALE AND DORR LLP
4  2100 Pennsylvania Ave. N.W.
   Washington, DC 20037
5  Telephone: (202) 663-6327
   Fax: (202) 663-6363
6
   Liv Herriot (State Bar No. 267694)
7  Liv.Herriot@wilmerhale.com
   WILMER CUTLER PICKERING
8    HALE AND DORR LLP
   2600 El Camino Real, Suite 400
9  Palo Alto, CA 94306
   Telephone: (650) 858-6138
10 Fax: (650) 858-6100

11 Henry Nikogosyan (State Bar No. 326277)
   Henry.Nikogosyan@wilmerhale.com
12 WILMER CUTLER PICKERING
     HALE AND DORR LLP
13 350 South Grand Avenue, Suite 2400
   Los Angeles, CA 90071
14 Telephone: (213) 443-5300
   Fax: (213) 443-5400
15
   Attorneys for Defendant
16 SHOPIFY, INC.

17

18            **UNITED STATES DISTRICT COURT**

19            **CENTRAL DISTRICT OF CALIFORNIA**

20                   **WESTERN DIVISION**

21 DKR Consulting LLC,                  | Case No.  2:23-cv-06904-HDV-JC

22                        Plaintiff,    | **MEMORANDUM OF LAW IN
                                        | SUPPORT OF DEFENDANT
23       v.                             | SHOPIFY INC.'S RULE 12(b)(6)
                                        | MOTION TO DISMISS AMENDED
24 Shopify, Inc.                        | COMPLAINT**

25                        Defendant.    | Hearing Date: April 11, 2024 at 10:00
                                        | a.m.
26                                      | Courtroom: 5B
                                        | Judge: Hon. Hernán D. Vera
27

28

29

30

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND .................................................................................................. 2

       A.     The Common Specification of the Buy Button Patents ...............................2

       B.     The Claims of the Buy Button Patents..........................................................4

       C.     Remaining Claims of the Buy Button Patents ..............................................6

III.   Legal Standard ..................................................................................................... 8

       A.     Motion to Dismiss Under Rule 12(b)(6) ......................................................8

       B.     Patent Ineligible Subject Matter under 35 U.S.C. § 101 .............................8

IV.    ARGUMENT ....................................................................................................... 9

       A.     *Alice* Step One: The Buy Button Patents' Claims Are Directed at an
              Abstract Idea ................................................................................................11

       B.     *Alice* Step Two: The Buy Button Patents' Claims Add No Inventive
              Concept .........................................................................................................14

       C.     The Remaining Independent Claims Are Also Patent Ineligible.................17

       D.     None of the Dependent Claims Describe Any Inventive Concept ..............19

V.     The Amended Complaint Does Not Plausibly Allege an Inventive Concept.................. 22

VI.    CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank International,*
    573 U.S. 208 (2014)............................................................................................. 1, 8, 9, 14

*Apple Inc. v. Ameranth, Inc.,*
    842 F.3d 1229 (Fed. Cir. 2016)......................................................................... 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................................... 8, 23

*Association for Molecular Pathology v. Myriad Genetics, Inc.,*
    569 U.S. 576 (2013)........................................................................................... 8

*Athena Diagnostics, Inc. v. Mayo Collaborative Services, LLC,*
    915 F.3d 743 (Fed. Cir. 2019).......................................................................... 23

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................... 8

*Bilski v. Kappos,*
    561 U.S. 593 (2010)........................................................................................... 4, 8

*Boom! Payments, Inc. v. Stripe, Inc.,*
    839 F. App'x 528 (Fed. Cir. 2021) .................................................................. 25

*Bozeman Financial LLC v. Federal Reserve Bank of Atlanta,*
    955 F.3d 971 (Fed. Cir. 2020).......................................................................... 21

*Bridge & Post, Inc. v. Verizon Communications, Inc.,*
    778 F. App'x 882 (Fed. Cir. 2019) .................................................................. 1

*buySAFE, Inc. v. Google. Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014)........................................................................ 9, 22

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
    927 F.3d 1306,1317 (Fed. Cir. 2019)............................................................... 24

*ChargePoint, Inc. v. SemaConnect, Inc.,*
    920 F.3d 759 (Fed. Cir. 2019).......................................................................... 14

*Chewy Inc. v. IBM Corp.,*
    No. 2022-1756, 2024 WL 925884 (Fed. Cir. Mar. 5, 2024)............................... 10, 11, 24

*Commil USA, LLC v. Cisco Systems, Inc.,*
    575 U.S. 632 (2015)........................................................................................... 8

*Content Extraction & Transmission LLC v. Wells Fargo Bank, National Association,*
    776 F.3d 1343 (Fed. Cir. 2014)........................................................................ 8

*Credit Acceptance Corp. v. Westlake Services*,
  859 F.3d 1044 (Fed. Cir. 2017)............................................................ 1, 9, 15, 18

*Customedia Technologies, LLC v. Dish Network Corp.*,
  951 F.3d 1359 (Fed. Cir. 2020)................................................................. 10, 15

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
  986 F.3d 1367 (Fed. Cir. 2021)...................................................... 8, 10, 11, 13

*Cyberfone Systems, LLC v. Cellco Partnership*,
  885 F. Supp. 2d 710 (D. Del. 2012), *aff'd sub nom. Cyberfone Sys., LLC v. CNN*
  *Interactive Grp., Inc.*, 558 F. App'x 988 (Fed. Cir. 2014) .................................. 4

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)........................................................................ 22

*Free Stream Media Corp. v. Alphonso Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021)
  .............................................................................. 9, 10, 11, 15, 16, 17, 18

*Funk Brothers Seed Co. v. Kalo Inoculant Co.*,
  333 U.S. 127 (1948)......................................................................................... 8

*IBM Corp. v. Zillow Group, Inc.*,
  50 F.4th 1371 (Fed. Cir. 2022) ................................................................. 24, 25

*In re Ashworth, Inc. Securities Litigation*,
  No. 99-cv-0121-L-JFS, 2001 WL 37119391 (S.D. Cal. Dec. 3, 2001) ............................ 23

*In re Elbaum*,
  No. 2021-1719, 2021 WL 3923280 (Fed. Cir. Sept. 2, 2021) .................................... 11, 13

*In re Herbalife, Ltd. Securities Litigation*,
  No. 14-cv-2850-DSF-JCG, 2015 WL 12734014 (C.D. Cal. July 28, 2015) ................. 22

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015).......................................................... 12, 13, 17

*Interval Licensing LLC v. AOL, Inc.*,
  896 F.3d 1335 (Fed. Cir. 2018).................................................................... 21

*Koehler v. Litehouse, Inc.*,
  No. 12-cv-04055-SI, 2012 WL 6217635 (N.D. Cal. Dec. 13, 2012)............................ 23

*Los Angeles Times v. Free Republic*,
  No. 98-cv-07840-MMM-AJWx, 2000 WL 565200 (C.D. Cal. Apr. 4, 2000) ................ 20

*Marble Voip Partners LLC v. Zoom Video Communication, Inc.*,
  No. 22-cv-2247-JAR-ADM, 2023 WL 3055323 (D. Kan. Apr. 24, 2023)  ................ 22

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
  566 U.S. 66 (2012)........................................................................ 8, 9, 19

*SAP America, Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018).......................................................................... 15

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*,
  873 F.3d 905 (Fed. Cir. 2017)............................................................................. 8

*Solutran, Inc. v. Elavon, Inc.*,
  931 F. 3d 1161 (Fed. Cir. 2019).......................................................................... 14

*Stuart v. Cadbury Adams USA, LLC*,
  No. 09-cv-06295-AHM-CW, 2010 WL 1407303 (C.D. Cal. Apr. 5, 2010) *aff'd*, 458 F.
  App'x 689 (9th Cir. 2011) ................................................................................. 22

*Tenaha Licensing LLC v. Tigerconnect, Inc.*,
  No. 19-cv-1400-LPS-SRF, 2020 WL 30426 (D. Del. Jan. 2, 2020)................................ 24

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014)......................................................................... 9, 22

*Universal Secure Registry LLC v. Apple Inc.*,
  10 F.4th 1342 (Fed. Cir. 2021) ......................................................................... 22

*Yuan v. Facebook, Inc.*,
  No. 18-cv-01725-EJD, 2021 WL 4503105 (N.D. Cal. Sept. 30, 2021).......................... 23

**STATUTES, RULES, AND REGULATIONS**

35 U.S.C. § 101 .................................................................................... *passim*

35 U.S.C. § 112(d) ...................................................................................... 7

Federal Rule of Civil Procedure 10(c) ............................................................... 22

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 2, 8, 23

## I.    INTRODUCTION

The concept of combining a product offering with an order form is a longstanding business practice that has been around for ages in, for example, magazine advertising (*see, e.g.*, example magazine advertisement from 1960s with order form).



With the development of the Internet, the practice of combining advertisements with order forms naturally moved to online platforms but maintained its essential character.  Computers implemented the exact same idea and, thus, made it easier for consumers to directly purchase products displayed on the Internet.  But while it is useful to have advertisements combined with order forms on the Internet, it is not eligible for patenting in the United States.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 212-13 (2014).  This is because combining advertisements with order forms—an age-old business practice—is an "abstract idea."  *See, e.g.*, *id.* at 226 (mediated settlement is an abstract idea); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology").

The four patents asserted in this case (collectively, the "Buy Button Patents") claim no more than the abstract idea of using conventional computer technology such as servers and web widgets to combine advertisements with order forms.  As the Federal Circuit has repeatedly recognized, this kind of computerization of a known business practice is not patentable.  *See, e.g.*, *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 893 (Fed. Cir. 2019) ("The ability to run a more efficient advertising campaign, even if novel, and even if aided by conventional computers, is an advance 'entirely in the realm of abstract ideas,' which we have

-1-

repeatedly held to be ineligible.") (citation omitted).

Therefore, under *Alice* and the numerous Federal Circuit and district court cases finding similar patents invalid on their face, DKR's amended complaint should be dismissed pursuant to Rule 12(b)(6) under 35 U.S.C. § 101.

## II.    BACKGROUND

### A.    The Common Specification of the Buy Button Patents

The Buy Button Patents are titled "System and Method for Distributable E-Commerce Product Listings," "System and Method for Generating and Distributing Embeddable Buy Buttons," "System and Method for Generating and Distributing Embeddable Electronic Commerce Stores," and "System and Method for Facilitating Social Shopping."  Because the patents originate from continuation applications of one another, they all share an identical written description.[1]

The specification of the Buy Button Patents confirms the purported invention relies on conventional computer technologies used in their ordinary manner to combine order forms with advertisements.  Figure 1A of the patents shows that the purported invention uses an ordinary "operating environment for a multimedia content distribution system," featuring various "client devices … communicatively coupled to a network **102**," which "[i]n the illustrated embodiment … is the Internet."  '678 patent, 3:31-50.  The Buy Button Patents claim nothing inventive about this operating environment and simply claim the conventional function of "managing the use of resources in the multimedia content distribution system" and "to receive and respond to content related requests from consumer client devices **130**, **132**, **134**."  *Id.*, 4:13-21.

For example, the content distribution system implements the abstract idea of combining advertisements with order forms using conventional components of client-server systems.  The Buy Button Patents use generic "consumer client devices" such as "laptop computers **130**, desktop computers **132** and various types of a mobile computing devices **134** such as personal digital assistants."  *Id.*, 3:35-41.  Those client devices are connected via the internet ("network **102**") and a firewall server ("server **104**") to a central server ("application server **106**") that

---

[1] For simplicity, all patent written description citations in this brief are to the '678 patent.

Case No. 2:23-cv-06904-HDV-JC                          MOTION TO DISMISS

performs the conventional function of "a centralized compute processing and transaction management resource." *Id.*, 3:43-49. The central server then relies on additional generic servers ("email server **108**," "database server **110**," "file management server **114**") to retrieve data from a "cloud-based storage resource **124**" and to use that data in connection with a "transaction processing service **112**." *Id.*, 3:58-67. The cloud-based storage resource **124** and the transaction processing service **112** are common functionalities provided by third parties such as "the Amazon Web Services group … using Amazon's 'Simple Storage Service'" and "'Flexible Payments Service.'" *Id.*, 5:6-15; *see also id.*, 18:8-12 (explaining that "Authorize.Net, Google Checkout, Storm Pay, PayPal or other Internet service" can be used).

Merchants, which the patents call "content owners," use the content distribution system no differently than any other generic distribution system for advertisements—they use their personal computer devices to "upload, register in a lookup table stored on the database server **110**, manage, package, price and create one or more compilations of stored and registered content for distribution to one or more consumer client devices **130**." *Id.*, 4:22-29. The content distribution system uses these "compilations" to supply the content of "web widgets." *Id.*[2]

Consumers interact with the web widgets in an ordinary, commonplace manner as well. They use "browsers executing on their client devices **130**, **132**, **134**" to activate web widgets by clicking on a "button or link" that the web widget displays. *Id.*, 5:32-37. These browsers are any generic browser such as "Internet Explorer, Firefox, Google Chrome, Safari, Opera" and do not require any specialized modifications or add-ons. *Id.*, 12:46-50. The specification explains that when a consumer goes online and "elects to purchase … by clicking on an embedded buy button" the web widget "redirects the consumer to the transaction processing service **112**." *Id.*, 5:40-50. Completing the transaction involves a conventional third-party service, as explained above, and ordinary payment methods like "credit card, debit card or bank account information." *Id.*, 5:48-49.

---

[2] The Dictionary of Computer and Internet Terms defines a "widget" as "a small software application on a web page." Lantier Decl, Ex. A at 3. The Authoritative Dictionary of IEEE Standard Terms defines "widget" as "[a] specific instance of a widget class, providing a control in the user interface, such as a menu, pushbutton, or text fields." Lantier Decl, Ex. B at 3.

-3-

1        These disclosures in the specification make clear that the patents' claimed invention uses

2    pre-existing technologies: a client-server content distribution system, web widgets, browsers,

3    online advertisements, and online transaction processing methods.  The patents then do nothing

4    more than direct the ordinary use of these conventional technologies to computerize the

5    longstanding business practice of combining advertisements with a method to order the

6    advertised product.

7        Indeed, the Buy Button Patents acknowledge that the computerization of advertisements

8    was routine at the time of the alleged invention.  '678 patent, 1:25-27 ("Electronic commerce on

9    the Internet has become commonplace;" "There are many merchants offering goods and

10   services via websites on the Internet.").  The Buy Button Patents further acknowledge that "web

11   widgets" were a known method for distributing content on the internet.  *Id.*, 1:61-64 (a "current

12   approach that is used to distribute applications of limited functionality involves 'web widgets,'"

13   which are "portable software that can be installed and executed within a hypertext-markup-

14   language web page.").  The alleged improvement of the Buy Button Patents is to create web

15   widgets that simply place a "buy button" next to product information and operate on a separate

16   server in an ordinary content distribution system.  *Id.*, 5:57; *see also id.*, Abstract, claim 1.

17       **B.**    **The Claims of the Buy Button Patents**

18        In total, there are 74 claims across the Buy Button Patents, only four of which are

19   featured in the body of the amended complaint.  Those four claims are representative of all

20   claims of the Buy Button Patents, which means that any one of these representative claims can

21   be used to determine patent eligibility under 35 U.S.C. § 101.  *See Bilski v. Kappos*, 561 U.S.

22   593, 612 (2010) (determining that eleven claims in a patent application were invalid after only

23   analyzing two claims in detail); *Cyberfone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710,

24   718-19 (D. Del. 2012) (invalidating all twenty-four claims of a patent after analyzing the first

25   claim), *aff'd sub nom. Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988

26   (Fed. Cir. 2014).  But in case the plaintiff contests that the four claims in its amended complaint

27   are representative, this motion addresses why each of the asserted claims is ineligible.

28        Claim 1 of the '678 patent, which is featured in the amended complaint, is typical of the

claims in the Buy Button Patents and recites the patent-ineligible abstract idea of computerizing

the established process of including an order form in a product advertisement:

> **1.** A system for distributing multimedia content over a network, comprising:
>
> **[a]** a server configured to control a transaction processing service; and
>
> **[b]** a storage resource communicatively coupled to the server and configured to store an item, wherein the item comprises an identifier, multimedia content, and metadata,
>
> **[c]** wherein the server is configured to:
>
>> **[c.1]** receive the item from the storage resource;
>>
>> **[c.2]** execute a widget builder resource configured to generate a product listing, wherein the product listing includes: (i) information associated with the item, (ii) a marketplace rule, and (iii) a clickable buy button;
>>
>> **[c.3]** distribute the product listing to a web site or a distributed application, wherein the product listing is configured to be displayed on the web site or the distributed application based on the marketplace rule;
>>
>> **[c.4]** receive an indication that the clickable buy button has been selected by a remote computing device; and
>>
>> **[c.5]** provide a checkout screen to the remote computing device, wherein the transaction processing service is configured to process a payment for a purchase of a product associated with the product listing, the purchase initiated from the checkout screen using the remote computing device.

'678 patent, claim 1.  In other words, claim 1 of the '678 patent recites a computer server

operating a **[a]** "transaction processing service" (i.e., a conventional payment service) over the

Internet, where the server includes **[c.2]** software that creates an advertisement with a clickable

"buy button" (i.e., conventional combination of a payment service in a web widget), and where

**[c.5]** selection of the buy button results in the appearance of a "checkout screen" (i.e.,

computerization of a generic order form) to process the customer's transaction.

The representative claims of the '237 patent and the '995 patent also claim the same

abstract idea performed using the same conventional computing components.  Claim 1 of the

'237 patent and claim 1 of the '995 patent (also featured in the amended complaint) are directed

to the same concepts with slightly modified claims that also recite the use of pre-existing

technologies in their ordinary, conventional manner.  '237 patent, claim 1 (requires an

"application server," omits the "marketplace rule" and "identifier"); '995 patent, claim 1

1    (requires "image and metadata" for the product, a "clickable link" that "is a buy button and

2    includes a preview of the product," and embedding into a "social media network").

3        Claim 1 of the '785 patent (also featured in the amended complaint) also claims the same

4    abstract idea with slightly modified limitations, such as renaming "widget builder resource" as

5    an "embeddable buy button builder," requiring that the "electronic commerce store" and "web

6    site" be operated by a "second server," and omitting some of the hardware limitations of the

7    other patents. '785 patent, claim 1.  But these modifications require no more than the ordinary

8    use of pre-existing technologies (conventional content distribution system with multiple servers,

9    generic web widgets, and ordinary incorporation of a third-party payment processing service) to

10   embed ordering instructions in an advertisement.

11       **C.**   **Remaining Claims of the Buy Button Patents**

12       The remaining independent claims of the Buy Button Patents do not have any

13   meaningful differences from the claims above for purposes of a patent eligibility analysis under

14   35 U.S.C. § 101.  For example, claim 9 of the '678 patent and claim 9 of the '237 patent both

15   require that the product listing be distributed to a website "operated by the server" or to an

16   application "not operated by the server."  '678 patent, claim 9; *see also* '237 patent, claim 9.

17   Similarly, claim 6 of the '995 patent recites embedding a product listing onto a website "not

18   operated by the application server."  '995 patent, claim 6.  Further, claims 15 of the '678 patent

19   and '237 patent recite displaying a product listing on "a social media network."  '678 patent,

20   claim 15; '237 patent, claim 15.  And claim 11 of the '995 patent also modifies limitations to

21   apply to a "social media network" as opposed to websites generally.  '995 patent, claim 11.

22   Lastly, claim 7 of the '785 patent recites the same purported invention of claim 1 (which is a

23   method claim) but in system claim format and claim 14 of the '785 patent recites that the "buy

24   button includes a hyperlink" and requires the use of "software" by the server executing the buy

25   button.  '785 patent, claims 7, 14.  These are all minor differences that capture different ways

26   conventional content distribution systems could use web widgets under ordinary conditions.

27

28

Case No. 2:23-cv-06904-HDV-JC                                    MOTION TO DISMISS

1    The 62 dependent claims[3] of the Buy Button Patents add trivial elements to the

2    independent claims and, like the independent claims, merely computerize the longstanding

3    business practice of combining advertisements with order forms.  For example, seven dependent

4    claims require servers to store generic information such as a "title" or "textual description."

5    '678 patent, claims 2, 10, 16; '237 patent, claims 2, 10, 16; '995 patent, claim 2.  Six dependent

6    claims dependent claims identify the kind of information stored in the content distribution

7    system or displayed in a product listing.  '237 patent, claims 4, 12, 18; '785 patent, claims 6, 11,

8    18.  Another six dependent claims require that the client device be an ordinary mobile device,

9    such as a smartphone.  '678 patent, claims 3, 11, 17; '237 patent, claims 3, 11, 17.  Three

10   dependent claims provide details on what a typical "marketplace rule" would be.  '678 patent,

11   claims 4, 12, 18.  Thirteen dependent claims require the use of a share link or receipt of an

12   indication when a share link is used.  '678 patent, claims 5, 6, 13, 14, 19, 20; '237 patent, claims

13   5, 6, 13, 14, 19, 20; '995 patent, claim 8.  Another thirteen dependent claims recite additional

14   limitations regarding the checkout process or the transaction processing service, all of which

15   just identify the different ways these steps are ordinarily practiced by conventional content

16   distribution systems.  '678 patent, claim 7; '237 patent, claim 7; '995 patent, claims 4, 10, 14;

17   '785 patent, claims 3, 4, 8, 9, 13, 16, 17, 20.  Eight dependent claims require that the buy button

18   or widget be usable on different websites or on social media (achieved with the ordinary use of

19   a separate server in a generic multi-server content distribution system).  '995 patent, claims 3, 5,

20   9, 12; '785 patent, claims 2, 10, 12, 15.  And, as described further below, six other

21   miscellaneous dependent claims add only conventional limitations to the independent claims.

22   '678 patent, claim 8; '237 patent, claim 8; '995 patent, claims 7, 13; '785 patent, claims 5, 19.

23       Again, there is nothing inventive about these additional limitations because they simply

24   identify different ways a conventional distribution system would use web widgets with buy

25   buttons when operated in a conventional, ordinary manner.

26

27   _____

28   [3] A dependent claim "contain[s] a reference to a claim previously set forth and then specif[ies] a
     further limitation of the subject matter claimed," thus "incorporat[ing] by reference all the
     limitations of the claim to which it refers." 35 U.S.C. § 112(d).

Case No. 2:23-cv-06904-HDV-JC                                    MOTION TO DISMISS

1

2

### III.   LEGAL STANDARD

#### A.   Motion to Dismiss Under Rule 12(b)(6)

3

4

5

6

7

8

9

10

In order for the amended complaint to survive a motion to dismiss, its factual allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Since "an invalid patent cannot be infringed," (*Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632, 644 (2015)), DKR's amended complaint does not state a claim for patent infringement because the patents are ineligible under Section 101 and thus invalid. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 909-10, 913 (Fed. Cir. 2017) (affirming the grant of a Rule 12(b)(6) motion to dismiss for patent infringement because the patents-in-suit were ineligible under § 101).

11

12

13

14

15

16

It is appropriate for this Court to find that the patents are ineligible under Section 101 on a motion to dismiss, and courts commonly do so. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1351 (Fed. Cir. 2014) (affirming dismissal of a patent suit under § 101). Indeed, over the last 10 years (since the U.S. Supreme Court's decision in *Alice*), district courts have dismissed more than 250 patent infringement suits for invalidity under Section 101 in response to a Rule 12 motion.

17

#### B.   Patent Ineligible Subject Matter under 35 U.S.C. § 101

18

19

20

21

22

23

24

25

26

27

28

The Supreme Court has recognized that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable" under 35 U.S.C. § 101. *Alice*, 573 U.S. at 216 (citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). This is because such concepts constitute the "basic tools of scientific and technological work" and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. V. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); *see also Bilski*, 561 U.S. at 602 ("The concepts covered by these exceptions are 'part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none.'" (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948))). Longstanding business practices, such as combining advertisements with order forms, are "abstract ideas," and thus are not patentable. *See*, *e.g.*, *cxLoyalty, Inc. v. Maritz Holdings*

-8-

*Inc.*, 986 F.3d 1367, 1377 (Fed. Cir. 2021) ("transfers of information relating to a longstanding commercial practice" are abstract); *see also Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1365 (Fed. Cir. 2021) (patent claims that "merely improve the abstract idea of targeted advertising … are directed to an abstract idea").

The Supreme Court has established a two-step framework for determining whether an invention claims a law of nature, natural phenomenon, or abstract idea and is thus patent-ineligible. *Alice*, 573 U.S. at 217. First, courts "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* Second, if it is, courts then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 78-79).

Since *Alice*, the U.S. Court of Appeals for the Federal Circuit has repeatedly recognized that computerizing or digitizing a known practice is a patent-ineligible abstract idea. *See, e.g.*, *Credit Acceptance Corp.*, 859 F.3d at 1055 (invalidating loan-processing automation patent because "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology"); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 712 (Fed. Cir. 2014) (claims directed to the abstract idea of using an advertisement as an exchange or currency were ineligible even though the claims recited a general purpose computer and the Internet); *buySAFE, Inc. v. Google. Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014) (claims directed to the abstract idea of creating a contractual relationship were ineligible despite the recitation of a computer that received and sent information over a network).

## IV.   ARGUMENT

The Buy Button Patents are invalid on their face because they claim patent ineligible subject matter under the two-step framework set forth in *Alice*. They claim nothing more than computerizing the common business practice of including an order form alongside a product offering or advertisement. The Federal Circuit's holding in *Free Stream Media*, for example, illustrates why. The asserted patent in *Free Stream Media* claimed a system that used television data to display targeted advertisements on a mobile phone. *Free Stream Media*, 996 F.3d at

1358.  As the court explained, the "asserted claims utilize three main components: (1) a network

device (e.g., a smart TV); (2) a client device (e.g., a mobile device); and (3) a relevancy

matching server."  *Id*.

Under step one of *Alice*, the Federal Circuit held that the *Free Stream Media* claims do

"nothing more than implement a computer to achieve the abstract idea of providing targeted

advertising to the mobile device user."  *Id*. at 1365; *see also Chewy Inc. v. IBM Corp.*, No.

2022-1756, 2024 WL 925884, at *8-10 (Fed. Cir. Mar. 5, 2024) (claims directed to targeted

advertising are abstract).  The court explained that the asserted claims (1) simply state that

devices in a network generate targeted advertisements by "overcoming a mobile device's

security sandbox" without explaining how to achieve such a result, and (2) "do not recite an

improvement in computer functionality."  *Free Stream Media*, 996 F.3d at 1363-64.  The court

further explained that even if the patent teaches a new way for devices in a network to

communicate, the asserted claims in *Free Stream Media* would still be invalid because that

communication relies on "generic processes and machinery" that "merely improve the abstract

idea of targeted advertising."  *Id*. at 1365; *see also cxLoyalty, Inc.*, 986 F.3d at 1377 ("Because

representative claim 1 is directed to transfers of information relating to a longstanding

commercial practice, the claim is directed to an abstract idea.") (internal quotations omitted);

*Chewy Inc.*, 2024 WL 925884, at *8 ("Even accepting that the claimed invention improves the

specificity and relevancy of online advertisements, this 'is at most an improvement to the

abstract concept of targeted advertising wherein a computer is merely used as a tool.'") (quoting

*Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020)).

The Federal Circuit in *Free Stream Media* then proceeded to *Alice* step two and found

that none of the individual elements, alone or in their ordered combination transformed the *Free

Stream Media* claims into a patent-eligible application of an abstract idea.  The court held that

the asserted claims recited bypassing a client device's sandbox security by using the pre-

existing idea of "working around the existing constraints of the conventional functioning of

television and mobile devices" and implementing that known work-around with "the use of

generic features, as well as routine functions."  *Free Stream Media*, 996 F.3d at 1366.  The

-10-

court further noted that these ordinary, pre-existing functions were implemented on "generic computing components—e.g., 'servers'—arranged in a conventional manner." *Id.*; *see also Chewy Inc.*, 2024 WL 925884, at *9 ("Using a generic database to store the information used in correlating advertisements with search results is not an inventive concept.").

*Free Stream Media* thus shows that patent claims directed at computerizing a business practice such as targeted advertising (or, as in the instant case, embedding ordering instructions in advertisements) implemented with conventional technology used in its ordinary manner are not patentable under § 101. The same analysis compels the same result in this case.

### A. *Alice* Step One: The Buy Button Patents' Claims Are Directed at an Abstract Idea

All claims of the Buy Button Patents are directed to the abstract idea of combining an order form with a product advertisement, and merely use conventional computer technology to implement that idea. When these generic technologies are disregarded, as they should be under the *Alice* test, the claim recites the longstanding business practice of combining an order form with a product advertisement (i.e., a product listing with a clickable link that leads to a checkout screen). This is an abstract idea. *In re Elbaum*, No. 2021-1719, 2021 WL 3923280, at *2 (Fed. Cir. Sept. 2, 2021) (rejecting as abstract claims directed to "a method of providing information and allowing customers to utilize that information to engage in a commercial transaction"); *see also cxLoyalty, Inc.*, 986 F.3d at 1377 ("transfers of information relating to a longstanding commercial practice" are abstract).

Claim 1 of the '678 patent, for example (set forth in full above), is a "system for distributing multimedia content over a network" (i.e., generic content distribution system) that comprises **[a]** "a server configured to control a transaction processing service" (i.e., generic server), **[b]** "a storage resource communicatively coupled to the server and configured to store an item" (i.e., generic data storage) where the server is configured to **[c.1]** "receive the item from the storage resource" (i.e., ordinary network connectivity via Internet), **[c.2]** "generate a product listing, wherein the product listing includes … a clickable buy button" (i.e., generic web widget with a link to a payment processor), **[c.3]** "distribute the product listing to a web site or a distributed application" (i.e., routine integration of web widgets on websites), **[c.4]** "receive an

-11-

1  indication that the clickable buy button has been selected" and **[c.5]** "provide a checkout screen"

2  (i.e., computerized order form). '678 patent, claim 1. **In layman's terms, this is simply the**

3  **use of computers and the Internet to generate a product advertisement that includes an**

4  **order form.**

5        Claim 1 of the '237 patent is directed to the same abstract idea. The claim recites a

6  "system for generating an electronic commerce store" that also requires "an application server

7  configured to control a transaction processing services" and "a storage resource

8  communicatively coupled to the application service." '237 patent, claim 1. The claim, similar

9  to claim 1 of the '678 patent, uses these generic computer components to "receive the

10  information from the storage resource," "generate a product listing, wherein the product listing

11  includes … a clickable link, wherein the clickable link comprises a buy button," "distribute the

12  product listing to a web site or a distributed application," "receive an indication that the

13  clickable link has been selected," and "provide a checkout screen." *Id*. These are all standard

14  computer components performing standard functions.

15        Claim 1 of the '995 patent is nearly identical to the representative claims in the '678 and

16  '237 patents. It recites an "application server" and "storage resource" that "generate a product

17  listing" with a "clickable link, wherein the clickable link is a buy button and includes a preview

18  of the product" and directs purchasers to a "checkout screen." '995 patent, claim 1. Again, the

19  claim recites the abstract idea of an advertisement embedded with a purchasing means and does

20  not claim any improvement to any underlying computer components or functions.

21        Lastly, claim 1 of the '785 patent is directed to the same abstract idea, with a superficial

22  difference: it takes the form of a method claim instead of a system claim. It also recites an

23  "electronic commerce store" and a "website" that operate on "a second server not operated by

24  the buy button provider." '785 patent, claim 1. But these limitations simply require that a

25  generic multi-server content distribution system have a separate server dedicated to operating a

26  buy button. This is merely a common-sense, conventional implementation of content

27  distribution systems. *See Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1371

28  (Fed. Cir. 2015) ("conventional computer components, such as a database and processors,

-12-

operating in a conventional manner … do not confer patent eligibility").  Again, other than standard computing components performing generic tasks, the claim is directed to nothing more than the abstract idea of combining a product advertisement with an order form.  And requiring that a website and an electronic commerce store be operated on a separate server is simply a routine implementation of a multi-server content distribution system where different functions are executed on different servers.  Thus, claim 1 of the '785 patent recites another generic instantiation (use of multiple servers for multiple distinct functions) of a content distribution system for web widgets with buy buttons.

The representative claims of the Buy Button Patents are directed to an abstract idea because, like the claims in *Free Stream Media*, stripping the claims of their standard computer components performing standard tasks leaves nothing more than an ordinary, abstract business practice—combining ordering instructions with an advertisement (i.e., a product listing with a buy button that leads to a checkout screen).  This is an abstract idea.  *In re Elbaum*, 2021 WL 3923280, at *2 (rejecting as abstract claims directed to "a method of providing information and allowing customers to utilize that information to engage in a commercial transaction"); *see also cxLoyalty, Inc.*, 986 F.3d at 1377 ("transfers of information relating to a longstanding commercial practice" are abstract).

That the asserted patents recite performing this idea on a website, using traditional computing components, does not save the claim from abstraction.  *See Intell. Ventures I LLC*, 792 F.3d at 1366 ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").  And, far from being an advance in technology, pre-Computer Age examples of combining an order form with a product advertisement are legion.  For example, mail-order forms were routinely included within print advertisements.  Magazine ads for particular products, which included a form that the recipient could fill out and mail in to purchase the depicted product(s), were a common marketing strategy in the 20th century.  For example, below are two examples from 1963 of advertisements including mail order forms for Walt Disney Mickey Mouse Latex Toys and binoculars:

-13-

1
2
3
4
5
6
7
8

 

Lantier Decl, Ex. C at 1.  Other than the use of generic computer components, the idea claimed

by the Buy Button Patents is no different than these advertisements with included order forms.

In *Alice* itself, the Supreme Court was similarly faced with claims that included multiple

steps implemented on generic computer components to implement an abstract idea:

intermediated settlement (i.e., the use of a third-party as a go-between for two parties to a

contract).  Despite the fact that the patent claimed use of computer components such as "a 'data

processing system' with a 'communications controller' and 'data storage unit,'" the Supreme

Court found the patent to be directed to the abstract idea of intermediated settlement.  *Alice*, 573

U.S. at 221, 226.  Following *Alice*, the Federal Circuit has routinely found patents to be directed

to abstract ideas even when they recite technical limitations.  *E.g.*, *ChargePoint, Inc. v.

SemaConnect, Inc.*, 920 F.3d 759, 768, 770 (Fed. Cir. 2019) (claims directed to the abstract idea

of network control despite reciting technical limitations such as "a control device to control

application of charge transfer" and "a transceiver"); *Solutran, Inc. v. Elavon, Inc.*, 931 F. 3d

1161, 1164, 1166 (Fed. Cir. 2019) (claims directed to the abstract idea of crediting a merchant

as early as possible while processing a check despite reciting a "data file," "MICR [magnetic

ink character recognition] information," and a "digital image scanner").  Thus, the Buy Button

Patents' recitation of purely conventional and generic computer components does not render

them non-abstract.

Therefore, the claims of the Buy Button Patents fail at *Alice* step one.

**B.    *Alice* Step Two: The Buy Button Patents' Claims Add No Inventive Concept**

The Buy Button Patents also fail the second step of the *Alice* test.  None of the elements

-14-

1    of the representative claims, alone or in combination, describe an improvement to technology

2    that would transform the claimed abstract idea into a patent eligible invention.

3    To the contrary, the Buy Button Patents use well-known conventional hardware and

4    software to implement the abstract idea.  As explained in *Free Stream Media*, this kind of "use

5    of generic features, as well as routine functions" cannot confer patent eligibility under § 101.

6    *Free Stream Media*, 996 F.3d at 1366; *see also Credit Acceptance Corp.*, 859 F.3d at 1056

7    ("[t]he use and arrangement of conventional and generic computer components recited in the

8    claims—such as a database, user terminal, and server—do not transform the claim, as a whole,

9    into 'significantly more' than a claim to the abstract idea itself.").

10    As detailed above, Buy Button Patents make clear that ordinary hardware and software

11    components are used in their everyday, conventional manner to practice the invention.  They

12    recite a conventional implementation of a central server that retrieves data from a storage

13    resource.  *See* '678 patent, 3:48-49 (central server performs the conventional function of "a

14    centralized compute processing and transaction management resource."), 3:66-4:1 ("cloud-

15    based storage resource" stores "all content files and related metadata.").  And, as noted earlier,

16    the '785 patent's representative claim's generic use of separate servers to operate separate

17    functionalities, such as web widgets, in a multi-server system is a generic implementation of a

18    content distribution system and does not make any improvement to pre-existing technology or

19    combinations thereof.  *See Customedia Techs.*, 951 F.3d at 1366 ("However, the invocation of

20    'already-available computers that are not themselves plausibly asserted to be an advance …

21    amounts to a recitation of what is well-understood, routine, and conventional." (citing *SAP Am.,*

22    *Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018)).

23    The other components recited in the Buy Button Patents likewise entirely consist of

24    well-known and conventional hardware, such as cloud servers, smartphones, PDAs, laptop and

25    desktop computers, as well as via conventional software services such as Amazon's Flexible

26    Payment Service, PayPal, Internet Explorer, Safari, Simple Storage Service, and Elastic

27    Compute Cloud, and conventional digital file formats such as MP3, WMA, and FLAC.  '678

28    patent, 3:36-43, 5:6-28, 10:44-49; 12:46-50.  And the Buy Button Patents confirm that the

-15-

1    "transaction processing service" operates in a generic manner by using a service such as PayPal

2    or Amazon Payment Services "for the provision of credit card, debit card, or bank account

3    information and completion of the purchase transaction." *Id.*, 5:47-50.

4         The Buy Button Patents also confirm that neither the web widget nor the buy button or

5    clickable link which leads to a check out screen provided by a third-party transaction processing

6    service describe an improvement to technology that would transform the claimed abstract idea

7    into a patent eligible invention.  The web widgets allow Internet users to access stored data and

8    the transaction processing service by creating "various marketing resources … buy buttons,

9    links and preview clips." *Id.*, 6:25-28.  And client devices use their web browsers to access the

10   Internet, and "clicking on a button, link or preview clip causes the activation of a web widget."

11   *Id.*, 6:30-31.  This was all a well-understood combination of pre-existing client-server

12   technology used as an ordinary content distribution system.  As in *Free Stream Media*, the Buy

13   Button Patents' ordinary use of hardware and software cannot confer patent eligibility because

14   the claims simply recite "generic computing components—e.g., 'servers'—arranged in a

15   conventional manner." *Free Stream Media*, 996 F.3d at 1366.

16        Moreover, the "widget builder resource" ('678 patent, claim 1) and "embeddable buy

17   button builder" ('785 patent, claim 1) are defined in purely functional terms and thus rely on the

18   same generic computer components.  *See* '678 patent, 6:25-26 ("The widget builder resource

19   component 204 is used to create … new web widgets, buy buttons, links and preview clips.").

20   The patents do not suggest that programming web widgets or buy buttons to have the claimed

21   functionality (even when operating on a separate server) was a difficult software engineering

22   problem, but even if it were, the claims do not recite a solution to this problem and therefore

23   cannot rely on it for an inventive concept.  *Apple Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241-42

24   (Fed. Cir. 2016) (holding patents invalid under § 101 when they "do not claim a particular way

25   of programming or designing the software … but instead merely claim the resulting systems"

26   and "[t]he difficulty of the programming details for this functionality is immaterial because

27   these details are not recited in the actual claims."); *Free Stream Media*, 996 F.3d at 1366 (an

28   "embedded object" limitation does not provide an inventive concept).

-16-

Similarly, the '995 and '237 patents' representative claims cover different conventional iterations of web widgets with clickable buy buttons. For example, the '995 patent uses a "social media network" instead of a web site, and the '237 patent uses a buy button that also provides "a preview" of the product. Both social media networks and product previews were conventional prior to the Buy Button Patents' priority date; neither of these limitations provides an inventive concept. *See, e.g.*, '995 patent, 1:42 (discussing "social media marketing" as prior art).

Finally, the "marketplace rule" ('678 patent, claim 1) likewise does not describe an improvement to technology that would transform the claimed abstract idea into a patent eligible invention. The Buy Button Patents do not describe any unique or novel way of applying the marketplace rule and instead merely claim using it. They simply recite, for example, "display[]" of goods available in certain countries to users only in those countries. This is nothing more than the abstract concept of targeted advertising. *Intell. Ventures I LLC*, 792 F.3d at 1370; *see also Free Stream Media*, 996 F.3d at 1362. The specification makes clear that the marketplace rule simply directs targeting consumers based on, for example, "territorial rights and restrictions (e.g., album collection A only available for sale in Spain, UK and France, but not in Italy, Germany, etc.), gross pricing terms, volume pricing discounts, and the starting and ending dates of sales or other product specials." '678 patent, 11:47-52.

In sum, the representative claims also fail at *Alice* step two.

### C.   The Remaining Independent Claims Are Also Patent Ineligible

The Buy Button Patents include eight other independent claims: claims 9 and 15 of the '678 patent, claims 9 and 15 of the '237 patent, claims 6 and 11 of the '995 patent, and claims 7 and 14 of the '785 patent. The patent eligibility problems of the representative claims apply with equal force to the remaining independent claims in the Buy Button Patents. The limitations of the remaining independent claims use generic computer components used in a conventional manner to display advertisements with ordering instructions on the Internet. This kind of computerization of a long-standing advertising or marketing business practice is not patent eligible subject matter. *See Free Stream Media*, 996 F.3d at 1363-66.

1    The remaining independent claims rely on the same individual elements as the
2    representative claims to recite the abstract idea of embedding ordering instructions in
3    advertisements.  The claims recite a "server," "storage resource," a "widget builder resource," a
4    "product listing," distributing the web widget to a "web site" or on "social media," a "clickable
5    buy button" or "link," and a "checkout screen" to process transactions.  '678 patent, claims 9,
6    15; '237 patent, claims 9, 15; '995 patent, claims 6, 11; '785 patent, claims 7, 14.  These
7    computer components are used in their ordinary manner to display on the internet a "product
8    listing" with a "buy button."  And when these standard technologies are disregarded, the claims
9    are left with nothing more than the abstract idea of combining ordering instructions with
10   advertisements (a "buy button" in a "product listing" that leads to a "checkout screen").

11       The arrangement and implementation of the individual elements in the remaining
12   independent claims also lack an inventive concept.  The remaining independent claims have the
13   same conventional arrangement of elements as the representative claims—a central server that
14   retrieves data from a storage resource, a web widget builder that creates a widget, displaying the
15   widget on the Internet, and having a buy button or clickable link lead to a check out screen
16   provided by a third-party transaction processing service.  The claims do not recite any
17   improvement on these technologies, nor do they require using these technologies in a manner
18   that is different from their ordinary, conventional use.  There can be no inventive concept in
19   such a routine arrangement and procedure involving commonly known components and uses
20   thereof.  *Free Stream Media*, 996 F.3d at 1366; *see also Credit Acceptance Corp.*, 859 F.3d at
21   1056 ("conventional and generic computer components … do not transform the claim, as a
22   whole, into 'significantly more' than a claim to the abstract idea itself.").

23       Lastly, the minor variations in the remaining independent claims do not add anything
24   that would render the claims patent eligible under § 101.  For example, claims 9 of the '678
25   patent and '237 patent require that the product listing is distributed to a website "operated by the
26   server" or to an application "not operated by the server."  '678 patent, claim 9; *see also* '237
27   patent, claim 9.  And claim 6 of the '995 patent similarly recites embedding a product listing
28   onto a website "not operated by the application server."  '995 patent, claim 6.  These are

-18-

modifications meant to capture different conventional implementations of a content distribution system, including the generic and obvious use of a multi-server system that uses separate servers to operate different functionalities (such as web widgets).  These are all trivial changes that involved no technological challenges and, even if they did, the Buy Button Patents do not provide any solutions on how to implement multi-server systems.  Similarly, claim 7 of the '785 patent is a system claim version of representative claim 1 of the same patent (which is a method claim) and claim 14 of the '785 patent adds the conventional and obvious limitations that the "Buy button includes a hyperlink" and requires the use of "software" by the server executing buy button—features that are necessary for a functioning buy button.  '785 patent, claim 7, 14. These limitations merely use generic terms like "software" and "hyperlink" to identify additional parameters that are routinely used for web widgets.

In sum, the remaining independent claims do not survive *Alice* step two because they use generic technology in a conventional manner to implement the claimed abstract idea.

### D.   None of the Dependent Claims Describe Any Inventive Concept

The Buy Button Patents include 62 dependent claims.  Each dependent claim can be categorized by the type of limitation recited—all of which add only "well-understood, routine, conventional activity" insufficient to confer patent eligibility.  *Mayo*, 566 U.S. at 79.

For example, seven of these dependent claims specify the kind of conventional information that the web widget includes, such as a "title" and a "textual description."  '678 patent, claims 2, 10, 16; '237 patent, claims 2, 10, 16; '995 patent, claim 2.  DKR cannot reasonably contend that the use of titles and descriptions can somehow transform abstract independent claims into patentable inventions.

Six of the dependent claims also specify that the client device in the content distribution system must be a "mobile device" or a "smartphone."  '678 patent, claims 3, 11, 17; '237 patent, claims 3, 11, 17.  The specification confirms that these mobile client devices are just "personal digital assistants," "smart phones," and "non-phone enabled PDAs.  '678 patent, 3:40-43.  These are generic mobile devices that were routinely used in content distribution systems.

Three dependent claims provide details on what a typical "marketplace rule" would be.

MOTION TO DISMISS

'678 patent, claims 4, 12, 18.  As explained above, the specification explains that these limitations simply direct using targeting advertising (e.g., distributing product listings only in geographic regions where the product is available).  '678 patent, 11:47-52.  Critically, the Buy Button Patents do not claim to have made any improvement on advertising to likely consumers.

Thirteen dependent claims require the use of a share link or receipt of an indication when a share link is used.  '678 patent, claims 5, 6, 13, 14, 19, 20; '237 patent, claims 5, 6, 13, 14, 19, 20; '995 patent, claim 8.  The patents do not claim to have invented share links or to have improved any technology associated with share links.  In fact, the patents admit that the use of share links was already a common means for "viral distribution" of content.  '678 patent, 1:45-48 ("[This] unique ability to share or 'virally distribute' content … now enables the Internet to be used as a highly social medium.").  And the patents confirm that this common usage of share links included the distribution of web widgets.  *Id.*, 1:61-62 ("One current approach that is used to distribute applications of limited functionality involves 'web widgets.'"); *see also L.A. Times v. Free Republic*, No. 98-cv-07840-MMM-AJWx, 2000 WL 565200, at *9 (C.D. Cal. Apr. 4, 2000) ("Linking is familiar to most Internet users, even those who are new to the web.").

Six dependent claims identify the kind of information stored in the content distribution system or displayed in a product listing.  '237 patent, claims 4, 12, 18; '785 patent, claims 6, 11, 18.  But again, the patents go no further than identifying the most generic, routine forms of information, specifically stating that the information would be an "image," "video," and "multimedia."  '237 patent, claims 4, 12, 18; '785 patent, claims 6, 11, 18.  This is just standard data routinely used by content distributions systems.

Thirteen dependent claims recite additional limitations regarding the checkout process or the transaction processing service, all of which just identify the different ways these steps are ordinarily practiced by conventional content distribution systems.  '678 patent, claim 7; '237 patent, claim 7; '995 patent, claims 4, 10, 14; '785 patent, claims 3, 4, 8, 9, 13, 16, 17, 20.  For example, some of these claims simply recite redundant limitations, such as that the transaction processing service be in communication with the server ('678 patent, claim 7) or that the buy

-20-

1    button provider is configured to execute the electronic store ('785 patent, claim 9).  Other

2    claims merely require that the third-party transaction processing service be proprietary without

3    providing any other details or requirements ('237 patent, claim 7; '995 patent, claim 10, 14).

4    Other claims recite conventional purchase methods: credit card, debit card, or bank account.

5    '995 patent, claim 4; '785 patent, claim 20.  And others simply recite variations of checkout

6    screens that allows for transaction processing.  '785 patent, claims 3, 4, 13, 16, 17.

7           Again, the Buy Button Patents do not claim to have improved any features relating to

8    checkout processes or transaction processing services, nor do they offer to use them in anything

9    other than their ordinary, conventional manner.  These thirteen dependent claims are simply

10   computerized versions of fundamental economic practices, such as credit-card payments, which

11   are ineligible for patent protection.  *Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955

12   F.3d 971, 978 (Fed. Cir. 2020) ("'[F]undamental economic practice[s] long prevalent in our

13   system of commerce' are examples of abstract ideas, which are ineligible subject matter.").

14          Eight dependent claims add limitations requiring product listings to appear on different

15   websites or on social media.  '995 patent, claims 3, 5, 9, 12; '785 patent, claims 2, 10, 12, 15.

16   But again, these limitations merely identify standard, conventional content distribution practices

17   of, for example, "distributing the product listing to a social media network" or being

18   "configured to be embedded into different web sites."  '995 patent, claim 5; '785 patent, claim

19   2.  And the patents admit that using different websites, including "social media marketing," to

20   advertise was a common practice before the patents' priority date.  '678 patent, 1:37-42.  Again,

21   these limitations recite conventional interactions with websites that content distribution systems

22   were ordinarily compatible with and regularly used.

23          Lastly, the Buy Button Patents include six miscellaneous dependent claims that add only

24   conventional limitations to the independent claims.  These claims recite, for example, the use of

25   multiple servers ('678 patent, claim 8; '237 patent, claim 8) which, as explained above, is a

26   conventional use of multi-server content distribution systems, or the servers collecting analytics

27   data ('995 patent, claim 7).  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1344 (Fed.

28   Cir. 2018) ("collecting, analyzing, and displaying that information, without more, is an abstract

-21-

1   idea."). These claims also recite how a product listing would appear, adding generic

2   requirements such as displaying "a title, a description, or a price" ('995 patent, claim 13), or that

3   the product listing must sell a "physical good or service" ('785 patent, claims 5, 19).

4       None of these limitations constitute an inventive concept, either alone or in concert,

5   because they simply recite the conventional use of a multi-server content distribution system

6   with generic variations of advertisements with ordering instructions on the Internet. *See*

7   *Ultramercial*, 772 F.3d at 716; *buySAFE*, 765 F.3d at 1355 (receipt and transmission of data

8   over computer network "is not even arguably inventive"); *CyberSource Corp. v. Retail*

9   *Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011); *Universal Secure Registry LLC v. Apple*

10   *Inc.*, 10 F.4th 1342, 1350 (Fed. Cir. 2021) ("Because sending data to a third-party as opposed to

11   the merchant is itself an abstract idea, it cannot serve as an inventive concept.").

12       In sum, the dependent claims add only routine concepts achieved with conventional

13   technology and, therefore, fail to recite patentable applications of the claimed abstract idea.

14   **V.    THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE AN INVENTIVE CONCEPT**

15

16       DKR's conclusory allegations of inventiveness in the amended complaint and the expert

17   declaration it seeks to incorporate do not defeat this motion to dismiss for four reasons.

18       ***First***, the Court should disregard the expert declaration entirely because it is not a

19   "written instrument" and thus not properly part of the complaint. *See, e.g.*, *Stuart v. Cadbury*

20   *Adams USA, LLC*, No. 09-cv-06295-AHM-CW, 2010 WL 1407303, at *4 (C.D. Cal. Apr. 5,

21   2010) *aff'd*, 458 F. App'x 689 (9th Cir. 2011) ("the expert report is not a 'written instrument'

22   that can be incorporated into a pleading"); *Marble Voip Partners LLC v. Zoom Video Commc'n,*

23   *Inc.*, No. 22-cv-2247-JAR-ADM, 2023 WL 3055323, at *3-4 (D. Kan. Apr. 24, 2023) (holding

24   in a patent case that "[expert] Declaration attached to the FAC … is not a 'written instrument'

25   under Fed. R. Civ. P. 10(c)."); *In re Herbalife, Ltd. Sec. Litig.*, No. 14-cv-2850-DSF-JCG, 2015

26   WL 12734014, at *1 (C.D. Cal. July 28, 2015) (granting motion to dismiss and striking expert

27   reports that "appear to have been generated for purposes of prosecuting this litigation" because

28   they "do not constitute 'written instrument[s]' under Rule 10(c)"); *see also* Fed. R. Civ. P. 10(c)

   (only "written instruments" may be incorporated into pleadings).

-22-

1       **Second**, even if the Court considers the declaration or the paragraphs of the amended

2   complaint incorporating them (*see* First Amended Complaint ("FAC") ¶¶ 59-67) they have no

3   relevance to the Rule 12 analysis because they are statements of expert opinion, not allegations

4   of **fact**. *See Koehler v. Litehouse, Inc.*, No. 12-cv-04055-SI, 2012 WL 6217635, at *3 (N.D.

5   Cal. Dec. 13, 2012) (granting motion to strike paragraphs in complaint discussing an expert and

6   assertion including "Dr. Carson opined" and "Dr. Carson also stated," and acknowledging that

7   the quotes from the expert report relayed expert opinion but "makes no statements of fact");

8   *Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained

9   in a complaint is inapplicable to legal conclusions").

10       The amended complaint pleads, for example, that Dr. Keller "provided opinion" on the

11   claimed improvement of the asserted patents.  FAC ¶ 59.  DKR then summarizes in a

12   conclusory manner the various opinions of Dr. Keller.  FAC ¶¶ 60-66.  DKR then concludes

13   that, "[b]ased on Dr. Keller's opinion, Shopify's characterization of the Patents-in-Suit as mere

14   computerization of a business practice fails …"  FAC ¶ 67.  These are all allegations of Dr.

15   Keller's "**opinion**" (emphasis added)—not allegations of fact—and, therefore, need not be taken

16   as true for purposes of Rule 12(b)(6).  Indeed, courts have repeatedly recognized that allegations

17   summarizing expert opinion do not provide a basis for withstanding a Rule 12(b)(6) motion to

18   dismiss.  *Yuan v. Facebook, Inc.*, No. 18-cv-01725-EJD, 2021 WL 4503105, at *3 (N.D. Cal.

19   Sept. 30, 2021) ("the Court will not consider Dr. Cain's opinions as set forth in paragraphs 722

20   through 724 of the [Third Amended Complaint ("TAC")] and any other portions of the TAC

21   that rely on those opinions"); *In re Ashworth, Inc. Sec. Litig.*, No. 99-cv-0121-L-JFS, 2001 WL

22   37119391, at *3-4 (S.D. Cal. Dec. 3, 2001) (striking paragraphs of complaint that discuss

23   attached expert declarations).

24       **Third**, even if the Court were to consider the declaration itself or the amended

25   complaint's discussions of Dr. Keller's allegations in paragraphs 59-67—which it should not—

26   their conclusory allegations of inventiveness do not change the analysis.  For purposes of

27   dismissal based on 35 U.S.C. § 101, allegations in the complaint or an expert declaration cannot

28   be used to contradict the patent itself.  *Athena Diagnostics, Inc. v. Mayo Collaborative Servs.,*

1  *LLC*, 915 F.3d 743, 756 (Fed. Cir. 2019) ("Because Athena's expert declaration made

2  allegations inconsistent with the '820 patent, the district court was not obligated to accept them

3  as true."); *Tenaha Licensing LLC v. Tigerconnect, Inc.*, No. 19-cv-1400-LPS-SRF, 2020 WL

4  30426, at *9 (D. Del. Jan. 2, 2020) ("Thus any extrinsic evidence supporting Plaintiff's

5  arguments (such as an expert declaration) would be contrary to the intrinsic evidence, and thus

6  need not be accepted as true."); *see also Chewy Inc.*, 2024 WL 925884, at *9 (even if expert's

7  statements are true, there is no inventive concept); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d

8  1306,1317 (Fed. Cir. 2019) (incorrect that "any allegation about inventiveness, wholly divorced

9  from the claims or the specification, defeats a motion to dismiss."); *IBM Corp. v. Zillow Grp.,

10  Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022) ("district court need not accept a patent owner's

11  conclusory allegations of inventiveness").  As detailed above, the Buy Button Patents

12  specifically state that the invention is wholly implemented using conventional computer

13  technology.

14          Contrary to Dr. Keller's opinions (FAC ¶¶ 60-66; Dkt. 36-5 ¶¶ 25-52), the Buy Button

15  Patents do not state or suggest that the patents describe a new technology enabling widgets with

16  processing features that directly allow purchases, widgets that operate on a separate server,

17  clickable links, compatibility with HTML structures or all websites.  Rather, the Buy Button

18  Patents expressly state that the alleged invention can be implemented using pre-existing

19  technology in its ordinary manner to embed buy buttons on websites.  *See above supra* § IV.B;

20  *see also* §§ IV.C.-D.  The patents simply direct the use of this ordinary technology to perform

21  the conventional function of embedding web widgets on websites, which the patents concede

22  were already used as "portable software that can be installed and executed within a hypertext-

23  markup-language web page."  '678 patent, 1:61-64 ("One current approach that is used to

24  distribute applications of limited functionality involves 'web widgets.'"), 1:67-2:2 (web widgets

25  allow "users to turn personal content into dynamic web applications which can be shared on

26  virtually any website"); *see also id.*, 18:9-13 (using "any one of Authorize.net, Google Check-

27  out, Storm Pay, PayPal, or other Internet service for transaction processing."); *see also Chewy

28  Inc.*, 2024 WL 925884, at *9 ("While [plaintiff] argues the claimed repository is specialized,

this is not supported by the [asserted] patent.  Instead, the patent broadly refers to an

'information repository' with no further details. … The claimed use of a conventional repository

for storing advertisements and associated search results in a well-known way is insufficient to

transform the abstract idea into patent-eligible subject matter.").

    *Fourth*, in addition to improperly relying upon Dr. Keller's opinions, the amended

complaint also makes conclusory non-specific allegations that the claims address "technological

problems" and "solve" those problems.  *See* FAC ¶ 40 (alleging that the Buy Button Patents

solve "various technological problems inherent in the distribution of multimedia content over a

computer communications network[.]"); *see also* ¶¶ 46, 52, 58.  These allegations do not

identify any technological problems that the Buy Button Patents purportedly solve, but instead

merely list various alleged characteristics of the invention that may be useful.  *Id.* ¶ 40.  The

allegation that these features solve "various technological problems" is thus wholly conclusory

and properly ignored under *Iqbal*, as no factual allegations specify what the purported

"problems" were or how the purported inventions of the Buy Button Patents overcame the

limitations of the prior art to address them.  *See IBM Corp.*, 50 F.4th at 1379 (affirming

dismissal because "the district court need not accept a patent owner's conclusory allegations of

inventiveness" and the complaint lacked "plausible and specific allegations that any aspect of

the claims is inventive."); *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533 (Fed.

Cir. 2021) (affirming dismissal when the "amended complaint repeatedly asserts that its claims

are not routine or conventional but does not provide plausible factual allegations to support

those assertions").  On the contrary, the five characteristics of the "invention(s)" that the

amended complaint touts are simply a straightforward application of the abstract idea of

presenting a product to a prospective buyer along with ordering information, using conventional

Internet technology.

## VI.    CONCLUSION

    For the foregoing reasons, this case should be dismissed because the claims of the Buy

Button Patents are directed to patent-ineligible subject matter under § 101.

-25-

1   Dated:  March 6, 2024                    By: /s/  *Henry Nikogosyan*

2                                            Gregory H. Lantier (*pro hac vice*)
                                             Gregory.Lantier@wilmerhale.com
3                                            Haixia Lin (*pro hac vice*)
                                             Haixia.Lin@wilmerhale.com
4                                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
5                                            2100 Pennsylvania Ave
                                             Washington, DC 20037
6                                            Telephone: (202) 663-6327
                                             Fax: (202) 663-6363
7
                                             Liv Herriot (State Bar No. 267694)
8                                            Liv.Herriot@wilmerhale.com
                                             WILMER CUTLER PICKERING
9                                                HALE AND DORR LLP
                                             2600 El Camino Real, Suite 400
10                                           Palo Alto, CA 94306
                                             Telephone: (650) 858-6138
11                                           Fax: (650) 858-6100

12                                           Henry Nikogosyan (State Bar No. 326277)
                                             Henry.Nikogosyan@wilmerhale.com
13                                           WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
14                                           350 South Grand Avenue, Suite 2400
                                             Los Angeles, CA 90071
15                                           Telephone: (213) 443-5300
                                             Fax: (213) 443-5400
16
                                             Attorneys for Defendant
17                                           SHOPIFY, INC.

18

19

20

21                      **CERTIFICATE OF COMPLIANCE**

22          The undersigned counsel of record for Shopify Inc. certifies that this brief contains 25

23   pages, which complies with the 25 page limit set by court order dated August 30, 2023.

24

25                                           By: /s/  *Henry Nikogosyan*

26                                           Henry Nikogosyan

27

28

-26-

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's EFC system on March 6, 2024.


By: /s/   *Henry Nikogosyan*

Henry Nikogosyan

Case No. 2:23-cv-06904-HDV-JC                                CERTIFICATE OF SERVICE